**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

**STANLEY THOMAS LOVEJOY,**

      **Plaintiff,**

**v.**                                                    **Case No.: 2:17-cv-02921**

**NANCY A. BERRYHILL,
Acting Commissioner of
Social Security,**

      **Defendant.**

**PROPOSED FINDINGS AND RECOMMENDATIONS**

      This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's applications for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The matter is assigned to the Honorable John T. Copenhaver, Jr., United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are Plaintiff's brief, requesting judgment on the pleadings, and the Commissioner's brief in support of her decision, requesting judgment in her favor. (ECF Nos. 17, 18).

      The undersigned has fully considered the evidence and the arguments of counsel. For the following reasons, the undersigned **RECOMMENDS** that Plaintiff's request for judgment on the pleadings be **DENIED**; the Commissioner's request for judgment on the

pleadings be **GRANTED;** and this case be **DISMISSED** and removed from the docket of the Court.

## I.    <u>Procedural History</u>

On August 27, 2013 and January 18, 2014, respectively, Plaintiff Stanley Thomas Lovejoy, ("Claimant"), filed applications for SSI and DIB, (Tr. at 224, 231), alleging a disability onset date of March 1, 2012,[1] due to "leg problems, left arm problems, [and] high blood pressure." (Tr. at 258). The Social Security Administration ("SSA") denied Claimant's applications initially and upon reconsideration. (Tr. at 115-24, 129-34). Claimant then filed a request for an administrative hearing, (Tr. at 135), which was held on January 28, 2016, before the Honorable Tierney Carlos, Administrative Law Judge ("ALJ"). (Tr. at 45-80). By written decision dated March 21, 2016, the ALJ found that Claimant was not disabled as defined by the Social Security Act. (Tr. at 29-38). The ALJ's decision became the final decision of the Commissioner on March 16, 2017, when the Appeals Council denied Claimant's request for review. (Tr. 1-4).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner subsequently filed an Answer opposing Claimant's complaint, and a Transcript of the Administrative Proceedings. (ECF Nos. 9, 10). Claimant filed a Brief in Support of Judgment on the Pleadings, (ECF No. 17), and the Commissioner submitted a Brief in Support of Defendant's Decision, (ECF No. 18), to which Claimant filed a reply. (ECF No. 19). Consequently, the matter is fully briefed and ready for resolution.

---

[1] By letter addressed to the Office of Disability Adjudication and Review dated March 17, 2015, Claimant amended his alleged onset date of both his DIB and SSI claims to April 2, 2013. (Tr. at 234). However, during his testimony at the administrative hearing, Claimant's counsel informed the ALJ that Claimant wished to return to his original alleged onset date of March 1, 2012. The request was granted. (Tr. at 52).

## II.    <u>Claimant's Background</u>

Claimant was 50 years old at the time he completed the instant applications for benefits, and 52 years old on the date of the ALJ's decision. (Tr. at 29, 58, 224, 231). Claimant left school in the eleventh grade, but subsequently obtained a mining certification. (Tr. at 59, 259). He communicates in English and has prior work experience as a laborer and as a roof bolter in the coal mining industry. (Tr. at 59-61, 259).

## III.    <u>Summary of ALJ's Decision</u>

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." *Id.* If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If so, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must assess the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, in the fifth and final step of the process, that the claimant is able to perform other forms of substantial gainful activity, given the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

In this case, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through June 30, 2015. (Tr. at 31, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since March 1, 2012, the alleged disability onset date. (Tr. at 31, Finding No. 2). The ALJ explained that Claimant had worked after March 1, 2012, but his wages did not rise to the level necessary to constitute substantial gainful activity. At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: "degenerative disc disease of the cervical and thoracic

spine, degenerative joint disease of the left knee, and osteoarthritis of the right knee." (Tr. at 31-32, Finding No. 3). The ALJ also considered Claimant's reports of left shoulder impairment and hypertension, but found that these conditions were non-severe. Furthermore, the ALJ evaluated Claimant's report of depression, noting that this condition was not a medically determinable impairment, as Claimant had not been diagnosed with depression and did not testify to having mental health issues. (Tr. at 32).

Under the third inquiry, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (*Id.* at Finding No. 4). Accordingly, he determined that Claimant possessed:

> [T]he residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the claimant could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. The claimant could never climb ladders, ropes, or scaffolds.

(Tr. at 32-36, Finding No. 5). At the fourth step, the ALJ determined that Claimant was unable to perform his past relevant work. (Tr. at 36, Finding No. 6). Therefore, under the fifth and final inquiry, the ALJ reviewed Claimant's past work experience, age, and education in combination with his RFC to determine his ability to engage in substantial gainful activity. (Tr. at 36-37, Finding Nos. 7-10). The ALJ considered that (1) Claimant was born in 1963, and was 49 years old on the alleged date of disability, which placed him in the category of an individual closely approaching advanced age; (2) he had a limited education and could communicate in English; and (3) transferability of job skills was not an issue because the Medical-Vocational Rules (the "Grids") supported a finding that Claimant was "not disabled," regardless of his transferable job skills. (Tr. at 36, Finding Nos. 7-9). Taking into account these factors, Claimant's RFC, and the testimony of a

vocational expert, the ALJ determined that Claimant could perform jobs that existed in significant numbers in the national economy, (Tr. at 36-37, Finding No. 10), including work as a product inspector, laundry worker, and price marker at the unskilled, light exertional level. (Tr. at 37). Accordingly, the ALJ concluded that Claimant was not disabled as defined in the Social Security Act and was not entitled to benefits. (Tr. at 37-38, Finding No. 11).

## IV.  <u>**Claimant's Challenges to the Commissioner's Decision**</u>

Claimant asserts that the ALJ erred in two respects. First, Claimant argues that the ALJ failed to adequately address Claimant's reliance on a cane to stand and walk. According to Claimant, the record contains substantial evidence demonstrating his need for a cane. Despite this evidence, the ALJ never explicitly discussed the issue and never provided a rationale for rejecting Claimant's contention that he relied on a cane. Claimant points to the vocational expert's testimony stating that Claimant would be unable to perform light exertional work if he required a cane. Claimant argues that if he is precluded from light level work, his other vocational factors mandate a finding of "disabled" under the Grids. For his second challenge to the decision, Claimant asserts that the ALJ erred by failing to give controlling weight to the RFC opinions expressed by his treating physician, Dr. Ira Morris.

In response, the Commissioner argues that Claimant is mistaken in his contention that the ALJ did not consider Claimant's alleged use of a cane. The Commissioner notes that the ALJ expressly commented on Claimant's statement that he needed a cane, and the ALJ made other references to evidence discussing hand-held assistive devices. However, the ALJ clearly was not persuaded that Claimant required a cane to walk and stand, because the evidence did not corroborate such a scenario. With respect to Dr.

Morris's opinions, the Commissioner cites to the applicable rules and regulations and maintains that the ALJ followed them to the letter. The Commissioner indicates that the ALJ provide multiple reasons for rejecting Dr. Morris's opinions, not the least of which was the inconsistency between Claimant's relatively mundane treatment notes and Dr. Morris's extreme RFC limitations.

## V.    Relevant Medical Evidence

The undersigned has reviewed all of the evidence before the Court, including the records of Claimant's health care examinations, evaluations, and treatment. The relevant information is summarized as follows:

### A. Treatment Records

On April 23, 2011, Claimant presented to Boone Memorial Hospital's emergency room complaining of knee pain. (Tr. at 413-17). He reported twisting his left knee at work while carrying a can of oil. A physical examination was performed and was negative, except for left knee effusion. An x-ray of Claimant's left knee revealed no evidence of acute fracture or malalignment. Claimant was diagnosed with left knee strain; given prescriptions for Naprosyn, a Medrol dose pak, and Lortab; and was discharged in good condition.

On July 22, 2011, Claimant returned to Boone Memorial Hospital with complaints of global left knee pain and swelling secondary to an twisting injury sustained while at work. (Tr. at 406-12). A physical examination revealed left knee pain and tenderness. X-rays of Claimant's left knee showed a cystic lesion on the superior patella; however, no acute fracture or dislocation was seen. The cyst was well circumscribed and appeared to be a benign subchondral cyst. (Tr. at 410). Claimant was diagnosed with left knee strain, provided prescriptions for Vicodin and Naprosyn, and discharged home in good

condition.

On September 1, 2011, Claimant was examined by Nurse Practitioner ("NP") Melanie Harper-Allen at Boone Memorial Hospital's Rural Health Clinic ("BMHRHC"). (Tr. at 332-33). Claimant complained of chronic low back pain and right leg pain that had been present for years. The low back pain was getting progressively worse, and the leg pain radiated down his leg. Claimant reported that he was injured in a mining accident several years earlier and was later "run over by a dump truck." (Tr. at 332). Claimant stated that he now possessed a medical card and wanted an MRI. On examination, Claimant weighed two hundred fifty pounds, with a height of six feet, two inches, and had a blood pressure of 148/80. He had no bowel or bladder loss. NP Harper-Allen assessed Claimant with lumbosacral neuritis and lumbago. She prescribed Daypro, Ultram, and Neurontin and ordered x-rays of Claimant's lumbar spine. (Tr. at 397-98). The x-rays showed mild to moderate degenerative changes, most noticeable at L3-4, but also involving L4 through S1 and T10-12. In addition, there was possible mild dextroscoliosis of the lumbar spine, but no evidence of abnormal alignment or definite spondylolysis.

On October 6, 2011, Claimant returned to BMHRHC with complaints of persistent low back pain that was not relieved by the prescribed medication. (Tr. at 334-35). Claimant also complained of pain in his right lower extremity. An examination by Physician's Assistant ("PA") Tarah Hagar revealed no somatic dysfunction, pain, or arthritic changes. Claimant's extremities were negative for edema, cyanosis, clubbing, and deformities, and his distal pulses measured +2/4. PA Hagar assessed Claimant with lumbago and provided prescriptions for Daypro, Neurontin, Motrin, Prednisone, and Ultram.

On October 24, 2011, Claimant presented to Dr. Ira Morris at Wharton Medical

Center with complaints of leg cramps that were worse in the right leg. (Tr. at 469). Claimant reported that he had not been getting regular medical care, but treated with another physician in the past, who prescribed Neurontin, and this medication was helpful in reducing the symptoms. Dr. Morris conducted a review of systems, which was negative except for leg cramps. Claimant's physical examination findings were normal. Dr. Morris was unsure of the cause of Claimant's cramps, so he ordered various diagnostic studies and prescribed Neurontin. (Tr. at 471).

On March 16, 2012, Claimant returned to Dr. Morris after suffering a back and upper leg strain at work the previous night. (Tr. at 472). Claimant stated that he needed "a night off work." (*Id.*). Claimant's lumbar spine was tender to palpation at L5, and he had a positive straight leg raising test bilaterally. Claimant was given a prescription of Robaxin.

Claimant presented to Boone Memorial Hospital's emergency room on April 12, 2012 with complaints of right leg pain due to a work injury that occurred two weeks earlier. (Tr. at 387-96). Claimant added that he had twisted his right leg earlier in the day, which had increased his leg pain. Claimant was ambulatory and his physical examination was largely normal, although he had back tenderness and decreased range of motion, tenderness to internal rotation, and decreased function of the right leg. X-rays of Claimant's hip, femur, and back were ordered. (Tr. at 391-92). The x-rays of his hip showed mild enthesopathic change (a disorder of muscle or ligament); an incidental benign primary bone tumor involving the proximal aspect of the right femur that was probably not of clinical significance; and no evidence of acute fractures, dislocations, malalignment, or bony abnormalities. X-rays of the right femur revealed a 4mm radiopaque foreign body proximal to the mid right thigh, but no evidence of acute fracture

or malalignment. X-rays of Claimant's lumbar spine were negative for acute fractures or malalignment, but showed moderate degenerative changes at L3-S1 and a transitional vertebra at L5. Claimant was diagnosed with lumbar and groin strain, given prescriptions and a three-day work excuse, and was discharged in fair condition.

Claimant returned to Boone Memorial Hospital's emergency room on May 1, 2012 complaining of right upper leg pain. (Tr. at 384-86). Claimant reported that he had been injured at work two weeks earlier, came to the emergency room, and was referred to a specialist, but had not yet seen the specialist. Claimant denied having trouble weight-bearing, and his physical examination was unremarkable. He was diagnosed with lumbar and groin strain; provided with prescriptions for Motrin, Flexeril, and Lortab; and given an excuse advising him to stay off work for two days.

On June 19, 2012, Claimant presented to Boone Memorial Hospital's emergency room for syncopal episodes, weakness, and lightheadedness that occurred the prior day. (Tr. at 374-83). Claimant surmised that his symptoms were caused by hypertension, indicating that he had taken blood pressure medication provided by a friend. Claimant's physical examination was unremarkable, except for low blood pressure, and he appeared to be in no acute distress. Claimant was "talking to all nurses, asking questions, very talkative." (Tr. at 375). An EKG reflected a borderline left axis deviation, and a tilt table test was positive. A CT scan of Claimant's head and brain showed a normal brain and skull, but moderate sinusitis in the right sphenoid sinus. The emergency room physician recommended admission to the hospital for further work-up; however, Claimant declined and asked to be discharged. He was diagnosed with hypotension and weakness and was released in fair, but stable, condition. Claimant was instructed to see his primary care physician.

On July 9, 2012, Claimant was again seen in the emergency room at Boone Memorial Hospital for complaints of left shoulder pain. (Tr. at 368-73). Claimant described rolling off a bench onto his left shoulder. A physical examination showed good range of motion without any obvious signs of injury. Claimant's neurological examination was normal, and he had no weakness of the extremities. The hospital records document that Claimant was under arrest at the time of the visit and refused to have an x-ray. Accordingly, he was discharged to police custody in good condition.

The following month, on August 4, 2012, Claimant returned to Boone Memorial Hospital's emergency room complaining of chronic pain in the right leg and left arm. (Tr. at 362-67). A physical examination revealed a mass in the left mid humerus. However, Claimant's neurovascular examination was normal, and he had no deformity, swelling, or range of motion deficit. The emergency room staff noted that Claimant had been in the emergency room on "several occasions but does not follow-up with [recommended] specialist." (Tr. at 364). Claimant was diagnosed with chronic pain and bicep tendon rupture. He was discharged in good condition.

On January 30, 2013, Claimant presented to Sriramloo Kesari, M.D., for Suboxone treatment. (Tr. at 420-21). Claimant traced his drug use history to 1995. He reported having been arrested in the past and charged with delivery of a controlled substance, for which he was placed on probation. Claimant admitted that he started "looking for a doctor to supply his drug habit" and "doctor shopped" to get medications. (Tr. at 420). Claimant reported that, other than his drug habit, "he [was] a healthy man." (*Id.*). Claimant advised that he needed to continue taking Suboxone, because without it, he would not be able to do his daily work at home or on the job. He was administered a toxicology screening test, which was negative for all substances except Suboxone, and his physical examination was

11

unremarkable. Claimant was diagnosed with substance dependence and provided an induction of Suboxone. He was advised to return the following day to ensure that his induction dosage was correct. Claimant returned to Dr. Kesari on January 31 reporting that he "felt good yesterday" and after returning home, he cleaned the house and washed dishes. (Tr. at 422-23).

Throughout 2013, Claimant saw Dr. Kesari regularly for Suboxone treatment. Beginning on February 7, 2013, Claimant was examined by Dr. Kesari twenty-four times: February 14, February 22, March 1, March 11, March 22, March 29, April 4, April 11, April 23, May 7, May 21, June 4, June 18, July 5, July 19, August 2, August 30 and September 20, October 8, October 21, November 7, December 5, and December 19, 2013. (Tr. at 424-65, 507-08). On February 7, Claimant's urine screen was positive for cocaine and amphetamines. He informed Dr. Kesari that he had taken a diet pill and Seroquel but would not use them anymore; otherwise, his screens were negative for all tested substances except Suboxone. Claimant was encouraged to participate in substance abuse counseling. At each visit in 2013, Dr. Kesari examined Claimant and recorded unremarkable findings.

On April 2, 2013, Claimant was seen in the emergency department at Boone Memorial Hospital with complaints of pain in the right thigh and knee due to an injury he received while holding up cables at work. (Tr. at 354-61). A physical examination was negative except for tenderness in the right mid/distal femur. A focused examination of Claimant's right knee examination was normal. X-rays of his right knee and right femur showed mild osteoarthritic changes of the right knee with no evidence of fracture or dislocation, no evidence of acute fracture or dislocation of the right femur, and no evidence of acute osseous pathology. (Tr. at 360-61). Claimant was diagnosed with right

12

upper leg pain and discharged in good condition.

On July 17, 2013, Claimant was taken by ambulance to Boone Memorial Hospital's emergency room for complaints of acute non-radiating right flank to low back pain that began earlier that day. (Tr. at 347-53). He had no complaints of dysuria, fever, hematuria, nausea, or vomiting. Claimant's physical examination was unremarkable; however, a CT scan of the abdomen and pelvis showed right obstructive uropathy with a three-millimeter calculus in the mid right ureter and secondary right-sided hydronephrosis. (Tr. at 353). Claimant was diagnosed with kidney stones, provided medication, and referred to an urologist. He was discharged in stable condition.

Claimant returned to Wharton Medical Center on September 3, 2013 asking to have his blood pressure checked and requesting a refill of Neurontin. (Tr. at 473, 490). Claimant complained of chronic right leg pain with increased difficulty walking and was now using a cane to ambulate. NP Christi Perry provided Claimant with prescriptions for Neurontin and Motrin. He returned later that month for a blood pressure check. (Tr. at 474, 489). Claimant also had questions concerning calcium, explaining that he been taking Methadone for ten years, but was no longer being prescribed that medication.

Claimant was seen by Dr. Ira Morris at Wharton Medical Center on October 18, 2013 for an increased cholesterol level and opioid addiction. (Tr. at 482). Dr. Morris did not examine Claimant, but discussed with Claimant recent laboratory results. Claimant was prescribed Lipitor for his high cholesterol level. Dr. Morris also discussed the need for Claimant to abstain from all drugs except Suboxone. Claimant returned to Dr. Morris one week later on October 28, 2013. (Tr. at 483-84). Claimant complained of a severe cough and congestion. On examination, he was alert and oriented and in no acute distress. His neurological system was intact and his gait was normal. There was no mention in the

clinical note of Claimant using a cane to walk.

Claimant returned the following month, on November 20, 2013, for follow-up of his cough. (Tr. at 485-86). Other than an inflamed throat and nasal drainage, his physical examination was within normal limits. Claimant was advised to continue another course of his prescribed medication to treat the acute bronchitis.

Beginning January 2, 2014, Claimant returned to Dr. Kesari for Suboxone treatment and continued to see Dr. Kesari for Suboxone treatment throughout 2014. (Tr. at 498-99, 508-09). At these visits, Claimant denied any health complaints; however, on February 17, Claimant was advised to go to the emergency room due to an elevated blood pressure of 180/82. (Tr. at 498).

On March 11, 2014, Claimant presented to Dr. Morris's office requesting an MRI of his legs, back, and arms. (Tr. at 487-88). Claimant told Dr. Morris that he had signed up for disability benefits due to pain in his legs and arm. Dr. Morris documented that a neurological examination confirmed "clear weakness" in Claimant's right leg, although the rest of the examination was normal. Prior to scheduling an MRI, Dr. Morris advised Claimant he would schedule an x-ray of Claimant's lumbar spine and order a sleep study. Claimant was diagnosed with acute bone pain and provided a prescription for Mobic.

On May 8, 2014, Claimant saw NP Harper-Allen at BMHRHC to obtain prescription refills. (Tr. at 551-53). Claimant complained of chronic right leg pain primarily located in the femur and foot, which was sharp, aching, and moderate in severity. He also reported occasional dizziness, which he treated by taking his mother-in-law's blood pressure medication. Claimant's physical examination was unremarkable. NP Harper-Allen assessed Claimant with lumbosacral neuritis, not otherwise specified.

On May 27, 2014, Claimant was seen in the emergency room at Boone Memorial

Hospital with complaints of pain in the right side of his neck, his back, and right leg. (Tr. at 554-63). Claimant's physical examination was normal, including intact range of motion, circulation, and sensation in all extremities. X-rays of his cervical, thoracic and lumbar spine were performed. (Tr. at 558-63). The cervical spine x-ray showed the prevertebral tissues of the spine to be within normal limits, with no indication of acute fracture or subluxation, but degenerative disc disease was noted, with the disc space height loss greatest at C2-C3 and C3-C4. The thoracic spine films revealed no evidence of acute fracture or subluxation, but degenerative disc disease was present in the lower thoracic spine, and there was mild scoliosis of the spine. X-rays of the lumbar spine showed no evidence of acute fracture or subluxation, but revealed degenerative disc disease and facet osteoarthritis, most prevalent at L3-S1, and dextroscoliosis. Claimant was diagnosed with chronic back pain and was discharged in good condition with prescriptions for Flexeril and Indocin.

On June 5, 2014, Claimant presented to NP Turner Blitz at BMHRHC for refills of Neurontin and Prilosec. (Tr. at 503-05). Claimant complained of back and bilateral lower extremity pain, which he described as moderate, constant, and chronic. He reported that Neurontin was effective with his pain. NP Blitz did not perform a musculoskeletal examination, but the remainder of the physical examination, including of the neurological system, was normal. NP Blitz assessed Claimant with lumbosacral neuritis, not otherwise specified, and GERD. He provided Claimant with prescriptions for Prilosec and Neurontin.

On July 15, 2014, Claimant underwent an MRI of the cervical, thoracic, and lumbar spine at Thomas Memorial Hospital. (Tr. at 512-16). The cervical spine imaging reflected the presence of multi-level disc disease, disc desiccation, and disk space narrowing at C2-

3, C3-4 and C5-6, as well as bulging annulus at C5-6, but no cord compression. A small central disc protrusion appeared at C2-3, along with a broad-based bulging annulus at C3-4, C4-5, without bony stenosis or other significant abnormalities. The thoracic spine showed minor diffuse degenerative changes throughout without focal encroachment into the neural foramina. Claimant had no cord compression, disc herniation, or spinal stenosis. The lumbar spine had significant disc disease at L3-4 and L4-5 with borderline spinal stenosis and foraminal narrowing, but no discrete disc herniation. A bulging annulus at the L3-4 level protruded toward the left neural recess with compression of the left nerve root.

Claimant was seen by PA Heather Jones at BMHRHC on August 4, 2014 for follow-up and medication refills. (Tr. at 519-20). Claimant continued to experience low back, neck, and leg pain, which he described as mild. Claimant stated that he currently had no primary care physician. He brought his MRI result with him and wanted someone to read it. He stated he "wanted to find a doctor to disable him," because he could not "work anymore." (Tr. at 519). Claimant was provided a prescription for Neurontin and was referred for a neurology consultation.

Claimant returned to BMHRHC on September 18, 2014 and saw NP Blitz. (Tr. at 521-23). Claimant complained of indigestion and pain in both lower extremities. His physical examination was normal, although no musculoskeletal or neurological examinations were documented. NP Blitz assessed Claimant with lumbosacral neuritis, lumbago, and GERD. He provided prescriptions for Neurontin, Motrin and Prilosec.

On September 24, 2014, Claimant presented for a neurosurgical consultation with Rida Mazagri, M.D., at Marshall University Neuroscience. (Tr. at 526-27). Claimant's chief complaints were back pain; right leg pain; tingling and numbness in both feet; and

16

ankle swelling. He reported having several prior work-related injuries, with the last one occurring in May 2012. Claimant was holding a heavy cable with the help of some co-workers. The co-workers let go of the cable, leaving Claimant to carry the entire weight. After that incident, Claimant's back pain increased and radiated into his right leg. Claimant rated his back pain severity as eight on a ten-point pain scale and stated that standing, walking, and bending exacerbated the pain. Claimant also reported constant tingling and numbness in both feet, with noticeable weakness of the right leg. His current medication regimen included Ibuprofen and Suboxone.

On examination, Claimant was alert, oriented, pleasant, calm and cooperative. (Tr. at 527). His cranial nerves and muscle tone were normal, but he had slightly exaggerated deep tendon reflexes in both knees going down toward his feet. Sensation was normal to touch and pinprick in both upper and lower extremities. Claimant had moderate restriction of lumbar flexion and extension; however, his straight leg raise test was negative. Dr. Mazagri reviewed Claimant's MRI films and saw no neural compromise or cord compression of the cervical spine; although, the lumbar spine reflected multilevel disc degeneration with foraminal narrowing on the right at L4-L5 and on the left at L3-L4.   Dr. Mazagri diagnosed Claimant with back and right leg pain most likely related to multilevel degenerative disc disease, most particularly foraminal narrowing at L4-L5 level on the right side. He discussed treatment options with Claimant; including weight loss, physiotherapy, epidural steroid injections, and medication. Dr. Mazagri felt Claimant's ankle swelling might be related to hypertension and advised him to see his primary care physician.

On September 26, 2014, Claimant was evaluated at Boone Memorial Hospital Physical Therapy. (Tr. at 530-33, 539). Claimant completed a form outlining his

symptoms, which included severe pain that made it difficult for Claimant to take care of his personal needs. He noted that he had to move "slow and careful," and lift only very light weight. (Tr. at 530). In addition, the pain prevented Claimant from walking any distance, sitting more than thirty minutes, and standing more than ten minutes; caused sleep issues; and restricted Claimant's social life and ability to travel. However, Claimant denied any reliance on hand-held assistive devices, like "a stick or crutches." (Tr. at 530). At this first therapy session, Claimant was assessed with fair rehabilitation potential. He continued with physical therapy on October 2, October 8 and October 10, 2014. By his session on October 10, Claimant reported a decrease in pain. (Tr. at 534-36).

On October 15, 2014, Claimant presented to Boone Memorial Hospital's emergency room on the advice of his physical therapist, complaining of left arm and right leg pain that was chronic and caused by an injury sustained while at work in 2013. (Tr. at 564-69). He described the pain as throbbing with a severity level of seven on a ten-point pain scale. On examination, Claimant had a deformity of the left bicep, described as a "popeye sign," and tenderness in the right quadricep; however, range of motion, sensation, and pulses were normal in all extremities. (Tr. at 564). Claimant was observed walking with a steady gait. X-rays were taken of Claimant's left humerus and right femur. The x-ray of the left humerus revealed possible mild degenerative change of the left AC joint and left glenohumeral joint, but no fracture or acute malalignment. X-rays of the right femur, while showing no fracture or malalignment, did reveal an abnormal appearance of the right hip joint with possible heterogeneous density of the proximal right femur with possible erosions that might be related to inflammatory arthritis, possible mild degenerative change of the right patellofemoral compartment, possible small right knee joint effusion, and possible non-specific anterior soft tissue edema involving the

right knee. Claimant was diagnosed with bicep tendon rupture and hip pain. He was discharged in good condition.

Claimant returned to physical therapy on October 15, 2014 and underwent four more sessions: October 17, October 22, and October 24. (Tr. at 577-80). Claimant complained of pain that hovered between five out of ten, to eight out of ten, with his best day being October 22 when he rated his pain at four out of ten. On October 24, the therapist recorded Claimant was progressing with his rehabilitation program. Claimant was not noted to be using a cane at these sessions.

On October 27, 2014, Claimant returned to Boone Memorial Hospital for an MRI of the upper left extremity due to pain with injury and/or deformity. (Tr. at 589). Robert Davis, M.D., reviewed the imaging and found no evidence of acute pathology, abnormal mass, fluid collection, or soft tissue abnormality.

Claimant returned to Boone Memorial Hospital Physical Therapy for two additional sessions: October 30 and October 31, 2014. (Tr. at 581-88). Claimant rated his low back pain at five out of ten, which was lowered from eight out of ten at the time he began therapy. Nonetheless, Claimant indicated that he did rely on a stick or crutches to walk, (Tr. at 585), although the treatment notes do not reflect Claimant's use of a hand-held assistive device at the sessions. The therapist concluded Claimant might benefit from further evaluation and discharged him to a home exercise program on October 31.

On November 17, 2014, Claimant was taken to Boone Memorial Hospital via ambulance after he fell from a standing position, slid down a muddy embankment, and landed on his left knee. (Tr. at 570-76). Claimant complained of pain and swelling of the left knee. On examination, his lower extremities appeared grossly normal other than thrombotic thrombocytopenic purpura noted on the anterior patellar and slightly painful

range of motion of the left knee. An x-ray of the left knee showed a mild degree of tricompartmental osteoarthritis with a small joint effusion, but no fracture was seen. A CT scan of the hip was unremarkable, with no indication of any acute bony abnormality. Claimant was diagnosed with knee and leg sprain, provided crutches, and discharged home in improved condition.

Claimant was examined on November 26, 2014 by PA Hager in follow-up of knee pain. (Tr. at 633-35). Claimant reported constant, moderate left knee pain resulting from a recent fall. He stated that the pain increased with walking and decreased when he wore a brace. Claimant indicated that he "has to wear a knee brace to be stable," and the record noted that he "walked with a cane." (Tr. at 634). An examination of Claimant's left knee revealed left lower extremity edema. PA Hager assessed Claimant with GERD and left knee pain. He was provided prescriptions for Motrin, Zantac and Neurontin.

Claimant presented one week later, on December 5, 2014, to Boone Memorial Hospital's emergency room with ongoing left knee pain after having a fall at home three weeks earlier. He reported pain in the lateral, posterior, and medial aspect of his knee, but stated that it did not radiate. Claimant described his pain level as eight out of ten, but he was able to partially bear weight using a brace and a cane. His physical examination revealed a tender, swollen, and warm knee with decreased range of motion. An x-ray of the left knee was negative for fracture or dislocation. (Tr. at 542-49). An MRI of the left knee showed a complete tear of the quadriceps tendon and caudal fibers of the quadriceps muscle, with a possible avulsion-type fracture to the patellar cortex; a lax patellar tendon with signal abnormality, suggesting partial tearing and/or tendinosis; probable partial interstitial tear of the anterior cruciate ligament; partial tearing of the lateral patellar retinaculum; and non-specific joint effusion with chondromalacia patella and

20

inflammation and/or hemorrhage in the subcutaneous fat planes. Claimant was diagnosed with internal derangement of the left knee and joint pain of the lower left leg. The emergency department personnel attempted to obtain an immediate orthopedic consultation, but the request was declined since Claimant did not have a fracture. Claimant was discharged home in stable condition. He was provided with instructions, an orthopedic referral, and a knee immobilizer.

On December 26, 2014, Claimant was seen by NP Harper-Allen at the BMHRHC for medication refills and knee pain. (Tr. at 636-38). Claimant's physical examination was unremarkable. He was provided prescriptions for Motrin, Zantac, and Neurontin. These medications were refilled in January 2015 by Dr. Richard Knapp at BMHRHC, who noted that Claimant had pain and tenderness in his back and left extremity. (Tr. at 639).

James Cox, D.O., an orthopedic specialist, examined Claimant on January 9, 2015 in follow-up to his left knee injury that occurred six weeks prior. (Tr. at 592-94). Since that time, Claimant had used a knee immobilizer and crutches. On examination, Claimant's upper extremities and right lower extremity demonstrated full range of motion without edema or cyanosis. His left knee, however, had a very large effusion with a palpable defect at the quadriceps insertion. Claimant could not accomplish active left knee extension. Dr. Cox diagnosed Claimant with a rupture of the left quadriceps tendon. He recommended that Claimant undergo surgical repair to which Claimant consented. Dr. Cox informed Claimant that he would require at least twelve weeks for healing and several months of rehabilitation in order to regain strength and function of his left knee. Dr. Cox told Claimant that his healing and rehabilitation would be hampered, and might even "contribute to an element of permanent disability," due to Claimant's delay of over a month in receiving treatment.

On January 15, 2015, Claimant underwent left quadriceps tendon repair by Dr. Cox at Charleston Area Medical Center. Claimant tolerated the procedure well. (Tr. at 598-600). Claimant returned to Dr. Cox for follow-up on January 21, 2015. (Tr. at 595-97). Although Claimant complained of severe pain, the wound appeared to be healing properly. Dr. Cox advised Claimant to continue using the knee immobilizer and return the following week for removal of surgical staples. The following week, on January 30, 2015, the surgical staples were removed. At that time, Claimant's medication regimen included Zantac, Lipitor, and Neurontin. (Tr. at 603-04).

One month later, on February 27, 2015, Claimant saw PA Chris Santangelo at Dr. Cox's office. Claimant reported that he fell a week prior to the visit. When asked, Claimant admitted that he had not used his knee immobilizer at all times, as instructed; however, he stated that he was wearing the immobilizer at the time of his fall.  (Tr. at 605-08). PA Santangelo documented a large effusion of Claimant's left knee and a deformity at the distal quadriceps tendon. Claimant was using an ace wrap and ice on his knee and walked with a cane. An examination revealed normal sensation, intact motor function, and brisk pulses. Claimant was neurovascularly intact; however, he had no active extension of his knee and only minimal active flexion. PA Santangelo assessed Claimant with recurrent left quadriceps tendon rupture. He prescribed Norco and Celebrex and advised Claimant to contact the office in order to schedule a revision of the left quadriceps tendon repair. However, on March 4, Claimant telephoned Dr. Cox and left a message that his mother had fallen and broken her hip, so he was not in a position to schedule the surgery. Moreover, he did not believe he needed revision surgery at that time. (Tr. at 609). Two weeks later, on March 17, Claimant telephoned Dr. Cox and left a message that the surgery scheduled for him on March 24 needed to be canceled, as he had a recent fall and now

had a new injury to his right leg. Claimant indicated he would call back when he was ready to schedule surgery. (Tr. at 610).

NP Harper-Allen examined Claimant at BMHRHC on April 17, 2015 for continued complaints of left knee pain and low back pain. (Tr. at 642-44). When examined, Claimant demonstrated pain in the left knee on palpation. He was provided with prescriptions for Lipitor, Motrin, Zantac, and Neurontin.

Claimant returned to Dr. Morris on April 21, 2015. (Tr. at 657). Claimant asked to talk to Dr. Morris about his musculoskeletal issues in reference to his application for disability, requesting that Dr. Morris document Claimant's inability to work. Dr. Morris noted that an MRI report taken in July 2014 had revealed Claimant had significant disc pathology at L3-4 and L4-5. Therefore, he diagnosed Claimant with back pain with radicular symptoms. The clinical record indicates that Claimant was ambulatory and makes no mention of a cane.

One week later, on April 28, 2015, Claimant was taken to Boone Memorial Hospital's emergency room via ambulance with complaints of left knee pain. (Tr. at 645-52). Claimant told Dr. Thomas Cortellesi that he had fallen while walking. Claimant complained of pain in the left knee, spasm, stiffness, tenderness, swelling, and decreased range of motion. He reported having undergone surgical repair of his left knee three months earlier; however, since then, he had fallen "several times" and was now unable to bear weight on his left knee. An examination of Claimant's left knee revealed decreased range of motion, deformity, ecchymosis, pain, swelling, and tenderness. The remainder of the examination, including that of Claimant's back, was normal. A CT scan of the left lower extremity showed mild degenerative changes in the medial compartment of the knee joint, small joint effusion, and bruising in the subcutaneous fat anterior to the

patella; however, no fracture or dislocation was seen. (Tr. at 667). Dr. Cortellesi diagnosed Claimant with internal derangement of the knee, knee effusion, knee hematoma, knee contusion, and myofascial pain syndrome. He was given Toradol, Norflex, Depo-Medrol, morphine, and Zofran in the emergency room. Claimant was discharged in good condition, ambulatory with use of a cane, and provided a knee immobilizer, as well as prescriptions for Anaprox and Flexeril. An appointment with Dr. Cox was scheduled.

The following day, on April 29, 2015, Claimant saw Dr. Morris requesting that he complete a disability questionnaire, which Claimant had received from his employer. (Tr. at 658).

On July 8, 2015, PA Kristina Stover at BMHRHC, saw Claimant for a medication refill request. (Tr. at 673-75). Claimant stated that he was "doing well," and that his chronic conditions were "controlled well" with prescribed medications.. His physical examination was unremarkable. Claimant received prescriptions for his current medication regimen. There is no record of Claimant using a cane or having difficulty walking.

On September 11, 2015, Claimant presented to Ernesto Yutiamco, M.D., at BMHRHC, requesting an MRI of his right hip and right knee due to pain. (Tr. at 676-78). Claimant also reported a long-standing back problem that started to worsen two weeks prior. A review of systems was normal, other than the noted complaints, and a physical examination was unremarkable. Dr. Yutiamco diagnosed Claimant with chronic low back pain, ordered an MRI, and advised Claimant to continue taking his mediations. Dr. Yutiamco did not document any gait abnormality or use of a cane.

Claimant returned to the BMHRHC on October 8, 2015 for examination by PA Heather Jones. (Tr. at 679-81). Claimant asked for an increase in Zantac and Neurontin.

PA Jones noted that Claimant had chronic back pain and pain in both extremities, but did not indicate that Claimant was using or needed a cane. She assessed Claimant with lumbosacral neuritis, not otherwise specified, GERD, and hyperlipidemia. She gave Claimant prescriptions for Neurontin, Motrin, Prilosec, and Lipitor.

On October 27, 2015, Claimant saw Dr. Morris reporting that he was having "major shelter problems-unable to sleep." Claimant was not examined, but was provided with Trazadone to help him sleep. (Tr. at 659).

On October 30, 2015, Claimant underwent an MRI of his right knee at Boone Memorial Hospital. (Tr. at 671-72). The MRI  showed a high-grade chondromalacia patella and patellofemoral osteoarthritis, meniscal degeneration posterior horn medial meniscus without meniscal tear or other internal derangement, and a small baker's cyst.

### B. Evaluations and Opinions

On May 15, 2014, Rabah Boukhemis, M.D., completed a physical residual functional capacity assessment. (Tr. at 101-04). Dr. Boukhemis opined that Claimant could occasionally lift and/or carry twenty pounds; frequently lift and/or carry ten pounds; stand, walk and/or sit about six hours in an eight-hour workday; and had unlimited ability to push and/or pull other than the stated restrictions for lift and/or carry. Claimant could occasionally climb ramps, stairs, ladders, ropes, and scaffolds, balance, stoop, kneel, crouch or crawl. He had no manipulative, communicative, visual, or environmental limitations. Dr. Boukhemis found Claimant to be only partially credible, noting that Claimant cared for his pets, performed self-care, cooked, was able to drive, and shopped. Dr. Boukhemis reduced Claimant's residual functional capacity to light level exertion.

On April 29, 2015, Dr. Ira Morris completed a questionnaire provided by

Claimant's counsel. The questionnaire required responses in the form of circling either "yes" or "no."  (Tr. at 613-16). Dr. Morris confirmed that he began treating Claimant in 2009. He uniformly answered "yes" when asked if Claimant had various conditions listed on the form; including, mild osteoarthritis of the right knee, degenerative changes and spurring of the left knee, mild to moderate degenerative changes at L4-S1, status post left quadriceps surgery performed in November 2014, L5 level transition vertebra, 4 millimeter foreign body in right femur, probable benign bone tumor, left bicep tear, chronic bilateral foot pain, ankle edema, hypertension, depression, anxiety, disc desiccation and disc space narrowing at C2-3, C3-4 and C5-6, central bulging annulus at C5-6, and foraminal narrowing at L4-5 due to disc bulge at left L4-5. The form did not require Dr. Morris to provide any clinical support for his answers, and he did not offer any such support. The form then asked Dr. Morris to evaluate whether Claimant was credible when he complained of certain symptoms. Dr. Morris answered that Claimant's complaints were entirely credible. Dr. Morris next provided a function-by-function assessment of Claimant's limitations, opining that in an eight-hour workday, Claimant could sit, stand and/or walk  up to one hour at a time; stand and/or walk a total of two hours; and should avoid hazardous machinery, stress, exposure to dust, fumes and gases, vibration, and unprotected heights. Dr. Morris believed Claimant was restricted to lifting no more than ten to fifteen pounds occasionally; could not bend more than occasionally; could not crouch, stoop, or squat; could not climb ladders or scaffolds; and could not reach more than occasionally. He added that Claimant would need to alternate between sitting and standing due to pain. The final question on the form asked if Dr. Morris believed Claimant was disabled from working, to which Dr. Morris circled "yes." Dr. Morris was not asked to explain any of his opinions or to reference supportive clinical

findings, and Dr. Morris did not offer any rationale or objective corroboration of his opinions.

### C. Claimant's Statements

In an Adult Function Report completed on September 3, 2013, (Tr. at 271-78), Claimant stated that his right upper leg gave him the most trouble. He also had difficulty wearing shoes because his "feet are so bad." (Tr. at 271). Claimant indicated that his daily activities included putting his children on the school bus and doing some housework. He also cared for a dog, a cat, and two rabbits. (Tr. at 272). Claimant described having trouble standing, which interfered with his daily activities. He admitted that he was able to prepare meals for his children, but stated that it took him longer than most people. (Tr. at 273). Claimant indicated that he could drive a car, go shopping, and count change. (Tr. at 274). He watched television, but could not participate in social activities. Claimant explained that he was unable to walk far and could not stand for very long, because the longer he stood, the more his legs hurt. (Tr. at 275-76). Claimant advised that he used a cane whenever he left the house, although it was not prescribed for him. (Tr. at 277).

Claimant updated his Adult Function Report on May 8, 2014 with the assistance of his attorney, Hazel Straub. (Tr. at 295-302). Claimant stated that he had severe pain in his right leg that prevented him from standing. He also had bilateral foot pain and swelling. Claimant carried a cane in his right hand that he used "to help walk half the time." (Tr. at 295). He described his daily activities as seeing his children to school, watching television, and fixing dinner. Claimant did very little around the house, relying on his daughter to do the chores. (Tr. at 296). Claimant denied being able to do yard work, but did still drive and go to the grocery store. (Tr. at 298). He had no hobbies that he could do other than watch television. Claimant stated that he could stand for ten minutes at a

time and would then have to rest at least twenty-five minutes. (Tr. at 300). He had trouble concentrating; could not follow written instructions well; could not remember oral instructions; and could not handle stress or changes in routine. (Tr. at 300-01).

Claimant testified at the administrative hearing that he suffered a job-related injury while working as a roof bolter in a coal mine in March 2012. (Tr. at 61). Despite the injury, he continued to work until May 2012, when the coal mine closed down. At that point, Claimant quit working altogether, because he was not physically able to do labor. Claimant stated that he suffered constant pain in his back, neck, and legs, which he described as eight out of ten in severity. (Tr. at 64). He took ibuprofen, Gabapentin, and Neurontin for his symptoms.

Claimant testified that he could walk about thirty yards, but had to use a cane to ambulate, even in the house. (Tr. at 66). He estimated that he could stand ten minutes at the most, and was unable to bend, stoop, or squat. Claimant indicated that he could sit comfortably for five to ten minutes and could carry a gallon of milk from the grocery shelf to the shopping cart, but could not carry it for much longer than that. (Tr. at 67). Claimant complained of having trouble sleeping due to leg pain and had to wait about two hours after getting up in the morning before he could manage his daily grooming. He stated that he relied on his eighteen-year-old daughter to do all of the housecleaning and cooking, as well as taking care of Claimant's other two children. (Tr. at 68). Claimant described a typical day's activities as getting out of bed, getting dressed after a couple of hours, running the dishwasher, moving from the couch to the recliner, and watching television. (Tr. at 69-70).

## VI.    **Standard of Review**

The issue before the Court is whether the final decision of the Commissioner is

based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v. Richardson*, the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). This Court is not charged with conducting a *de novo* review of the evidence. Instead, the Court's function is to scrutinize the record and determine whether it is adequate to support the conclusion of the Commissioner. *Hays*, 907 F.2d at 1456. When conducting this review, the Court does not re-weigh evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 2001) (citing *Hays*, 907 F.2d at 1456)). Moreover, "[t]he fact that the record as a whole might support an inconsistent conclusion is immaterial, for the language of § 205(g) ... requires that the court uphold the [Commissioner's] decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.'" *Blalock*, 483 F.2d at 775 (citations omitted). Thus, the relevant question for the Court is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig*, 76 F.3d at 589).

## VII.    **Discussion**

### A. *Claimant's Use of a Cane*

Claimant argues that the ALJ erred by not considering or discussing Claimant's use of a cane. Claimant further contends that this error was not harmless, because the

vocational expert testified that if Claimant required a cane, he would not be able to perform light level work. If Claimant were unable to perform light level work, then his combined vocational characteristics would direct a finding of "disabled" under the Grids. Claimant asserts that the record demonstrates Claimant's use of a cane, and Claimant used a cane at the administrative hearing. Therefore, the ALJ should have addressed and resolved the issue of whether Claimant's cane was "medically necessary." Claimant relies on Social Security Ruling ("SSR") 96-9P for his assertion that the lack of discussion in the written decision requires remand.

SSR 96-9P addresses the use of a hand-held assistive device by individuals capable of less than a full range of sedentary work; nevertheless, district courts within the Fourth Circuit have consistently referred to SSR 96-9P for direction when a claimant alleges that the ALJ failed to properly consider the claimant's use of a hand-held assistive device in the RFC analysis. *See Smith v. Colvin*, No. 4:15-CV-00175-RN, 2017 WL 27942, at *5 (E.D.N.C. Jan. 3, 2017); *Fletcher v. Colvin*, No. 1:14-CV-380, 2015 WL 4506699, at *8 (M.D.N.C. July 23, 2015); *Wimbush v. Astrue*, No. 4:10-CV-00036, 2011 WL 1743153, at *2–3 (W.D. Va. May 6, 2011); *Morgan v. Comm'r, Soc. Sec.*, CIV. No. JKB-13-2088, 2014 WL 1764922, at *1 (D. Md. Apr. 30, 2014); *Timmons v. Colvin*, No. 3:12CV609, 2013 WL 4775131, at *7–8 (W.D.N.C. Sept. 5, 2013); *Hamlin v. Colvin*, No. 8:12-CV-3601-RMG-JDA, 2014 WL 587464, at *13–14 (D.S.C. Jan. 23, 2014), *report and recommendation adopted*, No. 8:12-3601-RMG, 2014 WL 588073 (D.S.C. Feb. 14, 2014). SSR 96-9P provides that an ALJ must consider the impact of a "medically required" hand-held assistive device on a claimant's RFC. A hand-held assistive device is "medically required" when "medical documentation establish[es] the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed."

*Smith*, 2017 WL 27942, at *5 (citing SSR 96–9p, 1996 WL 374185, at *7). Importantly, "[a] prescription or the lack of a prescription for an assistive device is not necessarily dispositive of medical necessity." *Fletcher*, 2015 WL 4506699, at *8 (citing *Staples v. Astrue,* 329 F. App'x 189, 191–92 (10th Cir. 2009); *see also Crocker v. Colvin*, No. 1:15-CV-1215, 2016 WL 1626591, at *19 (E.D. Va. Apr. 21, 2016) ("Courts in the Fourth Circuit have held that even where a claimant is prescribed a cane, substantial evidence may support a conclusion that the cane is not medically necessary, and as such, an ALJ's decision not to consider the impact of a claimant's cane use on her residual functional capacity is not error.") (collecting cases); *Morgan*, 2014 WL 1764922, at *1.

As SSR 96-9P emphasizes, medical documentation establishing the need for a hand-held assistive device is important not only to establish medical necessity, but also to identify the circumstances for which the device is needed. The particular facts of the case are critical, because even when a hand-held device is medically necessary, its use may not significantly erode the occupational base at issue.  SSR 96–9p, 1996 WL 374185, at *7. If an ALJ finds that an assistive device, such as a cane or walker, is not "medically necessary," the ALJ is not required to include the use of the cane or walker in the claimant's RFC. *Fletcher*, 2015 WL 4506699, at *8.

In the instant case, the ALJ acknowledged in the written decision Claimant's statement that he used a cane, and the ALJ referenced and discussed exhibits that included notations of Claimant using a cane. In addition, the subject of Claimant's cane use was discussed at the administrative hearing. (Tr. at 76-77). Indeed, the ALJ reiterated that if Claimant's cane were medically necessary, he would not be capable of performing the light jobs identified by the vocational expert. Consequently, the ALJ was clearly aware of Claimant's assertion that he needed a cane. However, the ALJ did not include an

analysis of the medical necessity of Claimant's cane in the written decision.

Despite the lack of discussion in the decision, the ALJ did not err under the particular facts of this case for two reasons. First, the record demonstrates that the ALJ considered Claimant's use of a cane and acknowledged that the use of a cane would prevent Claimant from performing light level jobs. Therefore, the reviewing court is not left wondering whether the ALJ appreciated the issue. Second, the evidence of record does not demonstrate that Claimant's use of a cane was medically necessary, or that the use of a cane would be necessary for any extended period of time in the future.

The evidence demonstrates that in September 2013, Claimant stated in an Adult Function Report that he used a cane when he left the house, but the cane was not prescribed by a physician. (Tr. at 277). In a subsequent Adult Function Report prepared in May 2014, Claimant indicated that he used a cane "half the time" and carried it in his right hand. (Tr. at 295). However, there is little mention in the medical records of Claimant having a cane, and no documentation from any health care provider indicating that a cane was medically necessary to assist Claimant in walking or standing. Throughout 2013, Dr. Kesari examined Claimant one to three times per month and never noted that Claimant used a cane or was having trouble walking. (Tr. at 420-447, 507-09). NP Perry of Dr. Morris's office documented in September 2013 that Claimant was using a cane due to leg pain, but one month later, on October 28, 2013, Dr. Morris observed that Claimant was ambulatory and had a normal gait, with no mention of Claimant using an assistive device. (Tr. at 473, 483). Neurosurgeon, Dr. Mazagri, examined Claimant specifically for back pain, leg pain, and ankle swelling on September 24, 2014; Dr. Mazagri did not note that Claimant used or needed an assistive device and made no recommendation that one be prescribed. (Tr. at 526-27). After Claimant fell in November 2014 and ruptured his

knee, he briefly used a cane, but was then prescribed a knee immobilizer and crutches until he could have surgical repair. (Tr. at 542, 592). After surgery on his knee, Claimant's orthopedic surgeon, Dr. Cox, instructed Claimant to continuing using the knee immobilizer. (Tr. at 597). Dr. Cox did not prescribe a cane or recommend that Claimant use a similar hand-held assistive device. Claimant failed to wear the immobilizer as instructed, and subsequently fell two more times in 2015. After these falls, some medical records document that Claimant was using a cane, particularly during acute episodes, (Tr. at 542, 649), while other medical records created around the same time do not mention Claimant using or needing a cane. (Tr. at 633-34, 640-43, 647, 657, 658, 673-75, 676-77, 679-80).

The records indicate that Dr. Cox informed Claimant that he would need revision surgery after he fell and reinjured his tendon during the post-operative period, but Claimant initially refused to schedule the surgery and then canceled the procedure when it was scheduled by Dr. Cox. (Tr. at 609-610). As the Commissioner points out, once Claimant received the revision surgery in June 2016, he no longer used a cane. (Tr. at 8). Accordingly, a close review of the medical records establishes that Claimant walked without a cane or other assistive device far more often than he used a cane, and further indicates that no health care provider ever prescribed or recommended that Claimant use a cane. Therefore, the undersigned **FINDS** that the record did not establish the medical necessity of a cane; thus, the ALJ did not err in his implicit rejection of Claimant's contention that a cane was medically necessary.

### B. Treating Physician Opinion

Claimant next complains that the ALJ failed to assign appropriate weight to the medical source statements of Dr. Morris, one of Claimant's treating physicians. When

evaluating a claimant's application for disability benefits, the ALJ "will always consider the medical opinions in [the] case record together with the rest of the relevant evidence [he] receives." 20 C.F.R. § 404.1527(b). Medical opinions are defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [his] symptoms, diagnosis and prognosis, what [he] can still do despite [his] impairment(s), and [his] physical or mental restrictions." *Id.* § 404.1527(a)(2).

The regulations outline how the opinions of accepted medical sources should be weighed in determining whether a claimant qualifies for disability benefits. *Id.* § 404.1527(c). For claims filed prior to March 27, 2017 (such as Claimant's), the ALJ should give more weight to the opinion of an examining medical source than to the opinion of a non-examining source, and even greater weight to the opinion of a treating physician, because that physician is usually most able to provide a detailed, longitudinal picture of a claimant's alleged disability. *Id.* § 404.1527(c)(1)-(2). A treating physician's opinion on the nature and severity of an impairment may be afforded controlling weight when the following two conditions are met: (1) the opinion is well-supported by clinical and laboratory diagnostic techniques and (2) the opinion is not inconsistent with other substantial evidence. *Id.* When a treating physician's opinion is not supported by clinical findings, or is inconsistent with other substantial evidence, the ALJ may give the physician's opinion less weight. *Mastro v. Apfel,* 270 F.3d 171, 178 (4th Cir. 2001).

If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must analyze and weigh all the medical opinions of record, taking into account the following factors: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3)

supportability, (4) consistency, (5) specialization, and (6) various other factors. 20 C.F.R.
§ 404.1527(c)(1)-(6). The ALJ must provide "specific reasons for the weight given to the
treating source's medical opinion, supported by the evidence in the case record." Social
Security Ruling ("SSR") 96-2p, 1996 WL 374188, at *5 (S.S.A. Jul. 2, 1996).[2] Generally,
the more consistent a physician's opinion is with the record as a whole, the greater the
weight an ALJ will assign to it. *Id.* § 404.1527(c)(4); *see, also, Brown v. Comm'r Soc. Sec.
Admin.*, 873 F.3d 251, 268 (4th Cir. 2017) (highlighting three factors that could determine
the weight of a medical source's opinion and justify a deviation from the treating
physician rule: "supportability in the form of a high-quality explanation for the opinion
and a significant amount of substantiating evidence, particularly medical signs and
laboratory findings; consistency between the opinion and the record as a whole; and
specialization in the subject matter of the opinion."). Ultimately, it is the responsibility of
the ALJ, not the court, to evaluate the case, make findings of fact, weigh opinions, and
resolve conflicts of evidence. *Hays*, 907 F.2d at 1456.

Medical source statements on issues reserved to the Commissioner are treated
differently than other medical source opinions. SSR 96-5p, 1996 WL 374183. In both the
regulations and SSR 96-5p, the SSA explains that "some issues are not medical issues
regarding the nature and severity of an individual's impairment(s) but are administrative
findings that are dispositive of a case; i.e., that would direct the determination or decision
of disability," including the following:

> 1. Whether an individual's impairment(s) meets or is equivalent in severity
> to the requirements of any impairment(s) in the listings;
>
> 2. What an individual's RFC is;

---

[2]Social Security Rulings 96-2p, 96-5p, and 06-3p have been rescinded for claims filed on or after March 27,
2017; therefore, they still apply to this claim. *See* 82 FR 15263-01.

3. Whether an individual's RFC prevents him or her from doing past relevant work;

4. How the vocational factors of age, education, and work experience apply; and

5. Whether an individual is "disabled" under the Act.

*Id.* at \*2. "The regulations provide that the final responsibility for deciding issues such as these is reserved to the Commissioner." *Id.* Consequently, a medical source statement on an issue reserved to the Commissioner is never entitled to controlling weight or special significance, because "giving controlling weight to such opinions would, in effect, confer upon the [medical] source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine when an individual is disabled." *Id.* at \*2. Still, these opinions must always be carefully considered, "must never be ignored," and should be assessed for their supportability and consistency with the record as a whole. *Id.* at \*3. Ultimately, it is the responsibility of the ALJ, not the court, to evaluate the case, make findings of fact, weigh opinions, and resolve conflicts of evidence. *Hays*, 907 F.2d at 1456.

Here, the ALJ considered the medical source opinions. (Tr. at 35-36). He did not afford Dr. Morris's RFC opinions controlling weight; to the contrary, the ALJ gave them little weight. The ALJ explained that while Dr. Morris treated Claimant, the treatment rendered was not "extensive." (Tr. at 36). Moreover, Dr. Morris consulted with Claimant when filling out the disability questionnaire and likely adopted Claimant's subjective statements. The ALJ observed that Morris filled out a checkbox form and marked "yes" to indicate that Claimant had every condition listed on the form, including depression and

anxiety, even though Dr. Morris never diagnosed or treated Claimant for depression and anxiety. The ALJ was critical that Dr. Morris provided no explanation or clinical findings to bolster his opinions, which encompassed extreme limitations that were entirely inconsistent with Dr. Morris's relatively benign treatment records. Finally, the ALJ rejected Dr. Morris's opinion that Claimant was "disabled" from work, explaining that disability is not a medical finding, but is an administrative finding reserved to the Commissioner. (*Id.*).

The undersigned **FINDS** that the ALJ complied with governing rules and regulations in the manner in which he weighed Dr. Morris's medical source statement. The ALJ acknowledged that Dr. Morris was a treating physician, and the ALJ took into account the extent of the treatment provided by Dr. Morris. Likewise, the ALJ examined the supportability and consistency of Dr. Morris's statements with the evidence of record. If Dr. Morris's opinions were not well-supported by clinical or diagnostic findings, or were inconsistent with other substantial evidence, the ALJ acted entirely within his authority to reject them.

Here, Dr. Morris did not provide *any* clinical support or rationale for his extreme RFC limitations; as a result, they were not entitled to substantial weight. Moreover, the limitations provided by Dr. Morris were not substantiated by his clinical notations. Prior to Claimant's announcement in March 2014 that he had applied for disability benefits, Dr. Morris saw Claimant infrequently and treated him for chronic medical conditions like leg cramps, blood pressure fluctuations, the flu, and high cholesterol. After March 2014, Claimant went to Dr. Morris primarily for the purpose of having him complete disability paperwork.

Claimant argues that the ALJ was incorrect in his conclusion that Dr. Morris did not provide extensive treatment to Claimant, emphasizing that Dr. Morris had been Claimant's family physician for years before the alleged onset of disability. While it is true that Dr. Morris began caring for Claimant years before the alleged onset of disability, the ALJ was referring to the substance of the visits, rather than the length of the treatment relationship. The ALJ indicated that Dr. Morris did not provide much in the way of treatment to Claimant, and that observation is accurate. Claimant supplied records from various visits with Dr. Morris, which are briefly summarized as part of Exhibit 16F. (Tr. at 618). In the year before the alleged onset of disability, Claimant saw Dr. Morris on three occasions; once for leg cramps, once for the flu, and once for medication refills. (Tr. at 469-71). In the four years between the alleged onset of disability and the ALJ's decision, Claimant saw Dr. Morris nine times. (Tr. at 472, 474, 482-86). At one visit in March 2012, Dr. Morris gave Claimant medication for a back injury at work; at the next visit, in September 2013, Dr. Morris discussed Claimant's complaint of chronic leg pain and ordered some laboratory studies. No physical examination was documented in September 2013. (Tr. at 472, 474). The next three visits, all in 2013, involved treatment for cough, congestion, and high cholesterol. (Tr. at 482-86). The final four visits Claimant had with Dr. Morris occurred in 2014-2015, and all of these visits revolved around Claimant's pursuit of disability benefits. (Tr. at 487, 657-59). Dr. Morris examined Claimant on March 11, 2014, but did not examine Claimant at any of the remaining visits. Furthermore, Dr. Morris provided no documented care to Claimant from March 12, 2014 through March 21, 2016, the date of the ALJ's decision. As such, the ALJ accurately described the superficial treatment relationship between Claimant and Dr. Morris during the relevant period.

38

Claimant also criticizes the ALJ's supposition that Dr. Morris's disability questionnaire incorporated Claimant's subjective statements, arguing that the evidence does not support such conjecture. To the contrary, the record absolutely substantiates the ALJ's conclusion. Dr. Morris's clinical notes indicate that on April 21, 2015, the sole purpose of Claimant's visit to Dr. Morris was to ask for his "help in documenting [Claimant's] inability to work." (Tr. at 657). Moreover, on April 29, 2015, Claimant appeared at Dr. Morris's office with a disability questionnaire for Dr. Morris to complete. (Tr. at 658). Dr. Morris explicitly notes that the disability "questions [were] reviewed with [Claimant]." (Tr. at 658). Given that this visit occurred on the same date as Dr. Morris's RFC assessment, which was submitted in questionnaire form, the ALJ painted an accurate picture of Claimant's participation in the opinions rejected by the ALJ.

Finally, Claimant attempts to provide a *pro hac* rationalization for Dr. Morris's RFC limitations. However, these efforts are not persuasive. Claimant clearly communicated that he needed Dr. Morris's help in obtaining disability benefits; Dr. Morris complied with that request. Unfortunately, Dr. Morris failed to provide any clinical justification or cogent rationale to support his disability opinions. Accordingly, the undersigned **FINDS** that the ALJ had good reasons for rejecting Dr. Morris's RFC assessment and sufficiently articulated those reasons in the written decision.

Wherefore, having considered the challenges raised by Claimant; the evidence of record; the pertinent statutes, regulations, and rulings; and the arguments of the parties, the undersigned **FINDS** that the Commissioner's decision of nondisability was reached through a proper application of the relevant statutes, ruling, and regulations and is supported by substantial evidence

## VIII.  <u>**Recommendations for Disposition**</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **DENY** Plaintiff's request for judgment on the pleadings, (ECF No. 17); **GRANT** Defendant's request to affirm the decision of the Commissioner, (ECF No. 18); and **DISMISS** this action from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable John T. Copenhaver, Jr., United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (if received by mail) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

The failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Judge and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Copenhaver, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:** May 2, 2018

Cheryl A. Eifert
United States Magistrate Judge